# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

UNITED STATES OF AMERICA,

               Plaintiff,

vs.

JACQUES ROBINSON,

               Defendant.

Case No. 22-cr-60-CJW

**REPORT AND RECOMMENDATION
ON DEFENDANT'S MOTION TO
SUPPRESS**

_____

## I.  INTRODUCTION

On August 2, 2022, the Grand Jury charged Defendant with one count of Possession of a Firearm by a Prohibited Person in violation of 18 U.S.C. Sections 922(g)(1) and 924(a)(2).  (Doc. 3.)

The matter before me is Defendant's motion to suppress.  (Doc. 16).   The motion contained an inventory of items to be suppressed which includes, "Mr. Robinson's statements to authorities, a firearm, controlled substances, and any other evidence obtained as a result of the stop." (Doc. 16 at 1.)  The Government timely filed a response. (Doc. 22.)   The Honorable Charles J. Williams, United States District Court Judge, referred the motion to me for a Report and Recommendation.   I held a hearing on Defendant's motion to suppress on December 20, 2022.  (Doc. 23.)

The motion arises from a traffic stop of Defendant's car by a Cedar Rapids police officer.  Following the initial stop, Defendant fled in his car.  After a high-speed chase and a second stop, Defendant was arrested and his person and vehicle were searched. Defendant later made _Mirandized_ statements which are also at issue.

1

At the hearing, the following Government exhibits were admitted without objection:

1. Cedar Rapids Police Officer Sarah J. Lukan's "dashcam[1]" video;

2. Dashcam photo of intersection, on-ramp and street signs;

3. Dashcam photo of white Ford Fusion;

4. Dashcam photo of white Ford Fusion;

5. Dashcam photo of white Ford Fusion;

6. Dashcam photo of white Ford Fusion;

8. Video of search of vehicle/Officer Mosher's body worn camera ("BWC");

9. Video of jail interview;

10. Photo of firearm in vehicle;

11. Photo of firearm in vehicle;

13. Photo of bag with marijuana residue; and

14. Cedar Rapids Police Officer Cody Mosher's dashcam video.

Defendant seeks to suppress "statements to authorities, a firearm, controlled substances, and any other evidence obtained as a result of the search." (Doc. 16.)

At the hearing, the following defense exhibits were admitted without objection:

A. Cedar Rapids Police Incident/Investigation Report;

B. Officer Lukan's in car video; and

C. Citation and Complaint by the Cedar Rapids Police Department.

The Government called three witnesses: Officer Sarah Lukan, Officer Cody Mosher, and Officer Alex Rink. I found all witnesses credible. For the following reasons, I respectfully recommend that the District Court **Deny** Defendant's Motion to Suppress.

---

[1] "Dashcam" is a portmanteau of the words "dashboard" and "camera." The device records video essentially from the driver's perspective through a vehicle's front windshield.

## II.   FINDINGS OF FACT

Officer Lukan testified regarding her training and experience in law enforcement. She has attended the Cedar Rapids police academy as well as another law enforcement academy.  (Tr. 3[2].)  She had been a correctional officer for several months and an officer for the Council Bluffs Police Department for one year before joining the Cedar Rapids Police Department ("CRPD") in 2008.  (*Id.*)

On March 25, 2022, at about 11:44 p.m., Officer Lukan was driving a marked patrol car eastbound on the E Avenue Bridge.  The E Avenue Bridge is part of the Five-in-One Dam that crosses the Cedar River and also includes the Interstate 380 bridge. Officer Lukan was traveling in the left-hand lane approaching the intersection of First Avenue NE.  This intersection is controlled by a stop sign and flashing red lights.  Traffic proceeding eastbound in the left-hand lane enters an on-ramp for I-380 north.  (Gov. Ex. 2.)  Traffic in E Avenue's eastbound center lane proceeds onto A Avenue NE.  (*Id.*)

Officer Lukan's patrol car was equipped with a dashcam.  In addition to recording video through the patrol car's front window, the dashcam's software recorded other data such as time, vehicle speed, location, and whether certain vehicle equipment (e.g., lights, brakes, sirens, etc.) was engaged.  (Gov. Ex. 6.)  The dashcam video showed Officer Lukan's right turn onto eastbound E Avenue and her approach to the intersection. Defendant's vehicle, a white Ford Fusion ("the Fusion"), was immediately in view at the commencement of the video as Officer Lukan made her turn.   Both vehicles proceeded toward the stoplight, Officer Lukan in the lefthand lane and the Fusion in the center lane. The Fusion was ahead and to the right of Officer's Lukan's vehicle.  Officer Lukan's

---

[2] "Tr." Refers to the hearing testimony from the Court Reporter's rough draft of the transcript of the suppression hearing that was provided as a courtesy to the Court.  An official transcript of the hearing had not been entered into the docket at the time this Report and Recommendation was filed.

vehicle appeared to close the gap between them as both cars reached the stop sign at approximately the same time.

Officer Lukan testified that she came to a full stop at the stop sign and it appears from the video that the vehicle very briefly stopped at 23:44:46. (Gov. Ex. 1.) She testified that there was a "lag" between the speed shown on the dashcam display or "arbitrator camera." In other words, the speed shown does not necessarily reflect the actual speed of the vehicle shown simultaneously in the video. The video display does not show every gradation of speed as the car accelerates or decelerates. Moreover, the speed of Officer Lukan's car is not shown at zero at the point she testified she came to a complete stop.[3]

As Officer Lukan's patrol car proceeded through the intersection in her lane of traffic to the on-ramp, the Fusion accelerated ahead of the patrol car and into the lane leading to the on-ramp. Officer Lukan did not apply the brakes, but she took her foot off the accelerator to avoid a collision. (Tr. 7.) Officer Lukan described the Fusion's maneuver as having "cut [her] off" (Tr. 12) in violation of Iowa Code Section 321.306(1) which provides:

> A vehicle shall be driven as nearly as practical entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.

Because Officer Lukan had to "change [her] acceleration of speed" to accommodate the Fusion's lane change, she believed it was unsafe for the Fusion to have changed lanes at this point. The driver of the Fusion did not signal a change of lane by activating the

---

[3] Whether Officer Lukan came to a complete stop is not relevant in and of itself. However, if she had not stopped, as the driver of the Fusion might have anticipated, it might have affected the driver of the Fusion's perception of whether it was safe to change lanes. Ultimately, I find that, despite the "lag" in the report of speeds, Officer Lukan's testimony that she came to a complete stop should be credited.

vehicle's left turn signal.  Officer Lukan also believed the failure to signal was a violation of Iowa Code § 321.314 (Tr. 9) which provides:

> No person shall turn a vehicle from a direct course upon a highway unless and until such movement can be made with reasonable safety and then only after giving a clearly audible signal by sounding the horn if any pedestrian may be affected by such movement or after giving an appropriate signal in the manner provided in sections 321.315 through 321.318 in the event any other vehicle may be affected by such movement.

Iowa Code Section 321.314.

Officer Lukan followed the Fusion up the on-ramp and onto northbound Interstate 380.  She testified that she did not immediately initiate a traffic stop because it was dangerous to do so on the "S curve" at this location.  Rather, she followed the Fusion and ultimately stopped it near the intersection of I-380 and Coldstream Road / 32nd Street by turning on her overhead lights.  She decided to stop the Fusion based on the unsafe lane change, a violation of Iowa Code 321.306(1).  (Tr. 11.)

After the Fusion pulled to the side of the road, Officer Lukan approached its passenger side window.  She detected the smell of marijuana emanating from the vehicle and told Defendant (who she identified in court) he was stopped for an improper lane change.   She noticed that Defendant had bloodshot, watery eyes, and slurred speech, which are indicators he was under the influence of alcohol or a controlled substance.  (Tr. 12.)  Before Officer Lukan could ask for identification, Defendant drove off at a high rate of speed.  Officer Lukan testified that but for this initial stop, Defendant would not have driven away.  (Tr. 28.)  She announced over her radio that Defendant was leaving the scene.

Having heard Officer Lukan was at a traffic stop, Officer Cody Mosher[4] arrived at the scene in his patrol car as the Fusion sped away. Officer Mosher commenced the primary pursuit of the Fusion with his lights and sirens activated while Officer Lukan joined the pursuit from behind.

During the pursuit, Officer Mosher observed the Fusion reach a speed of 107 miles per hour in an area with a posted limit of 60. The Fusion ran red lights at the 42nd Street offramp and as it entered onto Highway 100 where it reached the speed of 82 in a 65 zone. Officers deployed stop sticks in an attempt to deflate the Fusion's tires, but the Fusion missed the sticks. After an additional pursuit, another law enforcement officer placed a vehicle in front of the Fusion and stopped it. Officer Lukan testified he believed there was probable cause to arrest Defendant for eluding under Iowa Code Section 321.279.

Defendant was ultimately apprehended in Hiawatha, Iowa after an approximately six-minute chase. When Defendant exited the Fusion, he was searched incident to arrest and four pills of a suspected controlled substance were found on his person. Officer Lukan believed this to be a violation of Iowa Code Section 155A.21.

After a drug detection canine alerted to the Fusion, it was searched and a loaded Walther 9mm firearm was located between the Fusion's front passenger and rear passenger seats. (Tr. 16.) Officer Alex Rink[5] was called and testified that he arrived at the scene and deployed his dog who indicated to the presence of controlled substances. (Tr. 53.) Law enforcement also determined that Defendant was the subject of

---

[4] Officer Mosher has two associates degrees in criminal justice and law enforcement. He graduated from the Cedar Rapids police academy in 2015 and has been a police officer with the CRPD since that time.

[5] Officer Rink is a 2013 graduate of the Iowa Law Enforcement Academy. He spent seven years with the Muscatine Police Department and has been with Cedar Rapids since July 2019. (Tr. 52.)

outstanding arrest warrants and was driving while his license was under suspension in violation of Iowa Code Section 321.218. In addition, Officer Lukan believed there was probable cause to believe Defendant had committed the crime of interference with official acts in violation of Iowa Code Section 719.1 by driving away from the initial stop and by his behavior at the time of his arrest; i.e., refusing to sit in the back of a police vehicle and threatening to spit in an officer's face. (Tr. 17.) Additionally, Defendant provided officers a false name which Officer Mosher believed to be interference with official acts. Officer Mosher also noticed signs Defendant might be impaired while driving including bloodshot, watery eyes, and slurred speech.

Defendant was transported to the jail and given *Miranda* warnings twice. He admitted he was "drunk," and a breath test showed he had blood alcohol content of 0.128. This led Officer Mosher to conclude there was probable cause to believe Defendant violated Iowa Code Section 321J.2 and was a second offense. After a second *Miranda* warning, Defendant admitted he was a convicted felon and that he carried a firearm every day. Officer Mosher testified that despite the evidence of intoxication, Defendant appeared to be able to understand and was capable of giving a valid consent to the interview.

### III.   DISCUSSION

#### A.   *The Parties' Arguments*

Defendant first asserts that Officer Lukan's initial stop of his vehicle was not supported by probable cause to believe a traffic violation occurred. (Doc. 17 at 2.) He further contends that all evidence gathered thereafter was fruit of the poison tree and must be excluded. (*Id.*) Defendant principally relies upon the dashcam video from Officer Lukan's car as evidence that no traffic violation occurred. Essentially, Defendant argues the video shows he changed lanes in a safe manner in conformance with Iowa Code Section 321.306(1). (*Id* at 3-4.) He also argues the fact that Officer Lukan followed

Defendant on the interstate for more than two minutes before stopping him indicates she did not believe an infraction had occurred. (*Id.* at 4-5.) Rather, Defendant hypothesizes that Officer Lukan merely had a hunch that the Fusion's driver might be intoxicated. (*Id.* at 5, n. 1.) Finally, Defendant argues that had Defendant stayed on the scene, all of the incriminating evidence in the vehicle would have been discovered and, therefore, it should be considered fruit of the poison tree. (*Id.* at 5-6.)

The Government argues the initial stop was supported by reasonable suspicion Defendant had committed a traffic violation by an unsafe lane change (Iowa Code Section 321.314) and/or by failing to signal the lane change (Iowa Code Section 321.315) (Doc. 22 at 6.) The Government argues that even if the initial stop was not supported by probable cause or reasonable suspicion, law enforcement had reasonable suspicion Defendant committed numerous crimes after leaving the initial stop including speeding, eluding, operating while intoxicated, running red lights, and interfering with official acts. (*Id.* at 7.) These subsequent crimes, the Government asserts, provided an independent basis for the subsequent arrest and concomitant searches of Defendant's person and vehicle. Moreover, the Government argues, the evidence derived from the second stop is sufficiently attenuated from the alleged illegality of the initial stop that it should not be suppressed as fruit of the poisonous tree.

**B.    *Legal Standards***

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "The Fourth Amendment prohibits unreasonable searches and seizures by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *United States v. Cortez*, 449 U.S. 411, 417 (1981)); *Terry v. Ohio*, 392 U.S. 1, 9 (1968)) (internal quotations omitted). "A traffic stop constitutes

a seizure for purposes of the Fourth Amendment and therefore must be supported by probable cause or reasonable suspicion." *United States v. Givens*, 763 F.3d 987, 989 (8th Cir. 2014) (citing *United States v. Hollins*, 685 F.3d 703, 705-06 (8th Cir. 2012)). Reasonable suspicion is based on "both the content of the information possessed by police and its degree of reliability." *Navarette v. California*, 572 U.S. 393, 397 (2014) (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)). Reasonable suspicion is based on the totality of the circumstances and requires a "particularized and objective basis" for suspecting legal wrongdoing before a stop can be justified. *United States v. Patrick*, 776 F.3d 951, 954 (8th Cir. 2015) (quoting *Cortez*, 449 U.S. at 417). A hunch does not constitute reasonable suspicion to justify a stop. *Wilson v. Lamp*, 901 F.3d 981, 986 (8th Cir. 2018) (citing *Terry*, 392 U.S. at 27). Rather, officers must be able to articulate "some minimal, objective justification for an investigatory stop." *United States v. Walker*, 555 F.3d 716, 719 (8th Cir. 2009) (quoting *United States v. Fuse*, 391 F.3d 924, 929 (8th Cir. 2004)). However, "[e]ven an officer's incomplete initial observations may give reasonable suspicion for a traffic stop." *Givens*, 763 F.3d at 989 (quoting *Hollins*, 685 F.3d at 706).

"A law enforcement officer whose observations lead him or her reasonably to suspect that a particular person has been or is about to be engaged in criminal activity may stop that person to investigate the circumstances that provoke suspicion." *United States v. Smart*, 393 F.3d 767, 770 (8th Cir. 2005) (citing *Arvizu*, 534 U.S. at 273; *Johnson v. Crooks*, 326 F.3d 995, 998 (8th Cir. 2003)). Even innocuous actions may give rise to reasonable suspicion under the totality of the circumstances. *United States v. Condelee*, 915 F.2d 1206, 1209 (8th Cir. 1990) (opining that "there could be 'circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot'") (quoting *Reid v. Georgia*, 448 U.S. 438, 441 (1980)).

Case 1:22-cr-00060-CJW-MAR     Document 24     Filed 01/13/23     Page 9 of 23

*United States v. Harvey* succinctly articulated the concept of reasonable suspicion in the context of a traffic stop:

> The concept of "reasonable suspicion" is not "readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates,* 462 U.S. 213, 232, 103 S. Ct. 2317, 2329 (1983). In large part, common sense dictates the analysis of reasonable suspicion.
>
> > The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behaviors; jurors as fact-finders are permitted to do the same and so are law enforcement officers.
>
> *United States v. Cortez,* 449 U.S. 411, 418, 101 S. Ct. 690, 695 (1981). Inherent in the concept of reasonable suspicion is the fact that officers may be mistaken in their beliefs. The keystone in such cases hinges on reasonableness. Under the law, "a reasonable but mistaken belief may justify an investigative stop." *United States v. Bailey,* 417 F.3d 873, 877 (8th Cir. 2005). *See also United States v. Garcia–Acuna,* 175 F.3d 1143, 1147 (9th Cir. 1999) ("A mistaken premise can furnish grounds for a *Terry* stop, if the officers do not know that it is mistaken and are reasonable in acting upon it.").

No. 14-00029-11-CR-W-GAF, 2015 WL 1197918, at *4 (W.D. Mo. Mar. 16, 2015).

In the context of traffic violations, a police officer may stop a vehicle only when the officer has "'at least a reasonable, articulable suspicion that criminal activity has occurred or is occurring,' and 'a traffic violation—however minor—creates probable cause to stop the driver of a vehicle.'" *United States v. Cox*, 992 F.3d 706, 709 (8th Cir. 2021) (quoting *United States v. Martin*, 411 F.3d 998, 1000 (8th Cir. 2005)). Generally, a traffic stop "is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996). A minor traffic violation is sufficient to establish probable cause for an officer to conduct a traffic stop even if the stop is pretext for another investigation. *United States v. Sallis*, 507 F.3d 646, 649 (8th Cir. 2007) (quoting *United States v. Coney*, 456 F.3d 850, 855-

56 (8th Cir. 2006)). An officer's actual motivation for making the stop beyond simply issuing a traffic violation is irrelevant provided that the officer has an objectively good reason for making the stop. *Id.*

## C. Analysis

### 1. Officer Lukan had reasonable suspicion to stop Defendant's vehicle for violation of a traffic law.

Defendant argues that Defendant's vehicle did not commit any traffic violations. However, the evidence easily supports Officer Lukan's belief that Defendant had unlawfully changed lanes and failed to signal. The failure to signal was a violation of Iowa Code § 321.314 (Tr. 9) which provides:

> No person shall turn a vehicle from a direct course upon a highway unless and until such movement can be made with reasonable safety and then only after giving a clearly audible signal by sounding the horn if any pedestrian may be affected by such movement or after giving an appropriate signal in the manner provided in sections 321.315 through 321.318 in the event any other vehicle may be affected by such movement.

Defendant gave no signal of his intention to change lanes as shown in the dashcam video and confirmed by Officer Lukan's testimony.

As stated above, Iowa Code Section 321.306(1) provides:

> A vehicle shall be driven as nearly as practical entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.

From his position in the center lane, it would have been necessary for Defendant to change lanes to proceed up the on-ramp to I-380. It was unlawful to change lanes without having first determined it was safe to do so. Officer Lukan had reasonable, articulable suspicion to believe Defendant's lane change "cut her off," that is, that the change had occurred without a determination that it was safe to do so. Officer Lukan had to "change [her] acceleration of speed" which would normally be increasing on an on-ramp to permit

merging with interstate traffic. She reasonably believed it was unsafe for the Fusion to change lanes at this point.

It is well established in this circuit that a violation of a traffic law or the officer's reasonable belief that a violation of a traffic law has occurred is sufficient probable cause to stop a vehicle, whether or not the officer had a separate motivation to stop the vehicle besides a traffic violation. *Cox*, 992 F.3d at 709 (a minor traffic violation is sufficient probable cause to stop a driver and the question is not whether a traffic violation occurred but whether the officer had an objectively reasonable suspicion that a traffic violation occurred); *Whren*, 517 U.S. at 806 ("[t]he temporary detention of a motorist upon probable cause to believe that he has violated the traffic laws does not violate the Fourth Amendment's prohibition against unreasonable seizures, even if a reasonable officer would not have stopped the motorist absent some additional law enforcement objective").

I find that Officer Lukan had probable cause to stop Defendant's vehicle based on the two traffic violations. Defendant's speculation about other motivations to stop Defendant is without merit. As *Sallis* noted, an officer's actual motivation for making the stop beyond simply issuing a traffic violation is irrelevant provided that the officer has an objectively good reason for making the stop. 507 F.3d 646, 649 (8th Cir. 2007) (quoting *Coney*, 456 F.3d at 855-56.) Defendant's speculation that Officer Lukan had a hunch Defendant could be intoxicated is immaterial. The fact that Officer Lukan followed Defendant to a point beyond the S-curve, where traffic stops may be unsafe, does not cast doubt on her belief that Defendant committed the violations or that she was following him in the hope he would commit additional violations.

Credibility determinations based on a witnesses' testimony are for the trial court to decide. *Id.* (quoting *United States v. Heath*, 58 F.3d 1271, 1275 (8th Cir. 1995)). Additionally, the question is whether the officer had an objectively reasonable suspicion that a traffic violation occurred not whether the traffic violation actually occurred. *Cox*,

992 F.3d at 709. Here, I find that Officer Lukan's testimony was credible and that she had objectively reasonable suspicion that Defendant illegally changed lanes and failed to signal the change.

### 2. *Even if the initial stop was unconstitutional, the evidence should not be suppressed as fruit of the poisonous tree.*

In case the Court disagrees with my conclusion about the constitutionality of the initial stop by Officer Lukan, I will address whether evidence must be suppressed as fruit of the stop.

Defendant's argument is interesting. Had Defendant not decided to flee the initial stop, he argues, all the evidence at issue would have been discovered in the course of Officer Lukan following up on the odor of marijuana she had deteced. Defendant asserts that the "entire sequence of events" was initiated by Officer Lukan's initial stop. While I agree with Defendant this is a possible or even likely course of events had he not fled, it is still counterfactual. Defendant did not remain on the scene. Nor did he simply go about his business in a lawful manner. Instead, he fled the scene in a reckless manner that involved the commission of numerous traffic violations and, when later stopped, he committed additional law violations. Following the second stop by law enforcement, their investigation disclosed active warrants and other evidence to give law enforcement a basis to search Defendant and his vehicle. Defendant does not assert that law enforcement failed to witness him committing these crimes as he fled and that no probable cause or reasonable suspicion existed to stop him for these subsequent crimes. Rather, Defendant seems to be arguing that the initial (and allegedly illegal) stop somehow insulates him from the results of his subsequent illegal conduct and the second stop. This position is not supported by the law.

The Eighth Circuit has held that "a defendant's response to even an invalid arrest or *Terry* stop may constitute independent grounds for arrest." *United States v. Dawdy*,

13

46 F.3d 1427, 1431 (8th Cir. 1995). In *Dawdy* these independent grounds were not fleeing from the scene, but resisting being handcuffed. As this Court has noted,

> The exclusionary rule does not apply when "the causal chain between an illegal arrest and evidence discovered afterwards [is] broken." *United States v. Ramos*, 42 F.3d 1160, 1164 (8th Cir. 1994). "The Eighth Circuit Court of Appeals has held that some intervening voluntary acts on the part of the arrestee, such as consenting to the search or resisting arrest, may be sufficient to purge the taint of an illegality." [*United States v.*] *O'Connell*, 408 F. Supp. 2d [712,] 725 [(N.D. Iowa)]; *see also, e.g., United States v. Dickson*, 64 F.3d 409, 410-11 (8th Cir. 1995). Any such act must be "sufficiently an act of free will to purge the taint of the preceding illegal detention." *Ramos*, 42 F.3d at 1164. Fleeing or otherwise unlawfully resisting arrest after an illegal detention creates a basis for a search and arrest that is sufficiently attenuated from the initial illegality. *See United States v. Dawdy*, 46 F.3d 1427, 1431 (8th Cir. 1995) ("[A] defendant's response to even an invalid arrest or *Terry* stop may constitute independent grounds for arrest.").
>
> Defendant relies on *O'Connell* to support his argument that the taint of his allegedly illegal detention cannot be purged because the purpose of Officer Bovy's traffic stop was to arrest Defendant. *See* Objections at 3-5. Defendant's argument is misplaced because *O'Connell* is inapposite. In *O'Connell*, no voluntary act by the defendant broke the causal chain between the police's illegal action and the discovery of evidence. *See O'Connell*, 408 F. Supp. 2d at 719-23. Instead, the court addressed the question of whether the police's own act of making a lawful arrest could break the chain. *See id.* at 725-27. In this case, by contrast, Defendant's flight from Officer Bovy was an intervening, voluntary act on the part of Defendant that sufficiently purged the subsequent search from any taint of illegality. *See Ramos*, 42 F.3d at 1164. Therefore, even if none of the three independent grounds Officer Bovy had for detaining Defendant were valid, Defendant's arrest and search would still be lawful based on his flight from police. Accordingly, the court shall overrule this objection.

*United States v. Carter*, 17-CR-2045-LRR, 2018 WL 3056678, at *4 (N.D. Iowa June 20, 2018). Then Magistrate Judge John Jarvey relied on *Dawdy* in a report and recommendation very similar to the case at bar:

14

Mr. Thurmond seeks the suppression of the gun and narcotics seized on August 2, 2004, as fruit of an illegal search. He cites no authority for his claim of entitlement to flee from a traffic stop. . . . Waterloo Police had sufficient probable cause to arrest Mr. Thurmond after Mr. Thurmond fled the initial traffic stop, led officers on a high-speed chase through Waterloo, brandished a weapon, and did not heed numerous requests by Officer Kemp to stop. Any evidence seized from Mr. Thurmond's vehicle, person, or any evidence he abandoned on August 2, 2004, after he eluded police, should be admissible.

*United States v. Thurmond*, CR05-2023, 2005 WL 2216896, at *3 (N.D. Iowa Sept. 12, 2005).

Moreover, this Court has expressly determined that fleeing from an unjustified *Terry* stop creates probable cause to effect an arrest for interference with official acts in violation of Iowa Code 719.1: "[E]ven if the officers were not justified in conducting *Terry* stop as detailed above, they had probable cause to arrest Gossman for interference with official acts once he resisted and started to run." *McElree v. City of Cedar Rapids, Iowa*, 372 F. Supp. 3d 770, 791 (N.D. Iowa 2019), aff'd sub nom. *McElree v. City of Cedar Rapids*, 983 F.3d 1009 (8th Cir. 2020). Then Magistrate Judge Leonard Strand expounded on the rationale behind the interference with official acts violation:

The purpose of Section 719.1 "is to enable officers to execute their peace-keeping duties calmly, efficiently, and without hindrance." *State v. Buchanan*, 549 N.W.2d 291, 294 (Iowa 1996) (citing *State v. Hauan*, 361 N.W.2d 336, 339 (Iowa Ct.App.1984)). Allowing an individual to make his or her own judgment as to whether an officer is acting "within the scope of the lawful duty or authority," and to resist or obstruct if the individual believes the answer to be "no," is not consistent with this purpose. In most situations in which there is any doubt about whether an officer is acting lawfully, that question may not be answered for weeks or months later, in the course of a judicial proceeding. Clark provides no support for the proposition that the Iowa Legislature intended Section 719.1 to authorize "self-help" interference with a peace officer's actions whenever there might be some possible doubt about the lawfulness of those actions.

15

Individuals subjected to conduct by a peace officer that is later deemed to be unlawful have various avenues of relief. Evidence gathered as a result of such unlawful conduct can be suppressed. Constitutional deprivations can be remedied through an action brought pursuant to 42 U.S.C. § 1983. I find no support, however, for the argument that Iowa law permits an individual to make his or her own snap decision as to the lawfulness of a peace officer's actions and to interfere with any actions he or she considers to be unlawful. This means that even if Weiland's attempt to stop Clark is ultimately found to have been improper, Clark's response to that attempt nonetheless gave rise to probable cause for Weiland to arrest her on a charge of interference with official acts. Clark was not entitled to resist or obstruct in hopes that the attempted traffic stop would someday be deemed unlawful.

*United States v. Clark*, CR15-3030-MWB, 2015 WL 5184490, at *6 (N.D. Iowa Sept. 4, 2015), report and recommendation adopted, CR15-3030-MWB, 2015 WL 6472256 (N.D. Iowa Oct. 27, 2015).

Defendant was not entitled to flee from even an allegedly illegal stop, lead law enforcement on a high-speed chase, commit a host of traffic crimes, interfere with official acts, and otherwise necessitate the second traffic stop. The searches that ensued were incident to his arrest for his commission of these later offenses or were the product of lawful searches as probable cause that developed as the second traffic stop progressed. The evidence was the product of these lawful searches and of properly *Mirandized* interviews of Defendant following his arrest on these subsequent offenses. Thus, the evidence need not be suppressed.

### 3. *No evidence need be suppressed as fruit of the poisonous tree.*

If the Court disagrees regarding my foregoing recommendations, it may need to address whether the evidence should be suppressed as fruit of the poisonous tree. Again, Defendant merely argues that, if he had not driven away, the evidence he now seeks to suppress would have been discovered during a search that was, in his view, inevitable

16

once Officer Lukan detected marijuana smoke.  Defendant cites no authority to support his view that all the evidence must be suppressed because the illegal *Terry* stop was, in essence, the "but-for" cause of the seizure of the evidence.  Nor does he address the attenuation issue.  As the Government points out, there is no such "but for" rule,

> Although the United States Supreme Court has refused to adopt a per se, or "but for," rule that would make inadmissible any evidence, whether tangible or live-witness testimony, where such evidence is obtained through a chain of causation that began with an illegal arrest, *United States v. Ceccolini*, 435 U.S. 268, 276, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978), we note, once again, the familiar precept that "the indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality." *New York v. Harris*, 495 U.S. 14, 19, 110 S.Ct. 1640,109 L.Ed.2d 13 (1990).  Nevertheless, evidence obtained under these circumstances may be admissible if "the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the 'taint' imposed upon that evidence by the original illegality." *United States v. Crews*, 445 U.S. 463, 470, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980).

*United States v. Simpson,* 439 F.3d 490, 495 (8th Cir. 2006).

The Eighth Circuit has said,

> In order to determine whether challenged evidence is the fruit of an illegal search or seizure, "the defendant bears the initial burden of establishing the factual nexus between the constitutional violation and the challenged evidence." *United States v. Marasco*, 487 F.3d 543, 547 (8th Cir.2007).  Once the defendant comes forward with specific evidence demonstrating taint, the ultimate burden of persuasion to show the evidence is untainted lies with the government. *Alderman v. United States*, 394 U.S. 165, 183, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969).  In other words, the government must show the evidence obtained after the illegal search was not "come at by exploitation of that illegality [but] instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun*, 371 U.S. at 488, 83 S.Ct. 407.

*United States v. Riesselman*, 646 F.3d 1072, 1079 (8th Cir. 2011).

Here, I find that Defendant has not met his initial burden of establishing a causal nexus between the allegedly unlawful *Terry* stop and the discovery of the evidence. Officer Lukan testified that "but for" the initial stop, Defendant would not have driven away. (Tr. 28.) This establishes nothing more than an obvious part of the sequence of events. While Officer Lukan testified that she detected the odor of marijuana and noticed signs of possible intoxication, she was not asked what additional investigation she would have made at the initial stop, if Defendant had not fled. It might be reasonable to speculate that further investigation by Officer Lukan at the time of the initial stop would have led to recovery of the evidence Defendant seeks to suppress. However, there is no evidence in the record to support this speculation. Thus, Defendant has not established this nexus.

Because the Court may disagree with me on whether Defendant met his initial burden, I will address the Government's argument regarding attenuation. The Government asserts the evidence is sufficiently attenuated to make it admissible. Under this doctrine, a constitutional violation leading to the discovery of evidence does not require exclusion when only an attenuated connection exists between the constitutional violation and discovery of the evidence. *Utah v. Strieff*, 579 U.S. 232, 238 (2016). *Strieff* stated, "Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" *Id.* (quoting *Hudson v. Michigan*, 547 U.S. 586, 593 (2006)).

The Eighth Circuit has held:

> At issue is the "attenuation doctrine," an exception to the exclusionary rule that applies "when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected

by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" *Utah v. Strieff*, ––– U.S. –––, 136 S. Ct. 2056, 2061, 195 L.Ed.2d 400 (2016) (quoting *Hudson v. Michigan*, 547 U.S. 586, 593, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006)).

We use a three-part test to determine whether the attenuation doctrine applies. "First, we look to the temporal proximity between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search. Second, we consider the presence of intervening circumstances. Third, and particularly significant, we examine the purpose and flagrancy of the official misconduct." *Id*. at 2062 (citations omitted).

*United States v. Lowry*, 935 F.3d 638, 642–43 (8th Cir. 2019)

Here, six minutes passed from the initial stop at 11:47 p.m. (Ex. 1 at 23:47) and the second stop at 11:53 p.m. (*Id*. at 23:53.) The evidence on Defendant's person was recovered shortly thereafter. This short period of time would not, perhaps, ordinarily mediate in favor of a finding of attenuation. However, the chase that ensued after Defendant fled the initial stop is chock full of intervening circumstances, i.e., a high-speed chase with multiple traffic violations and attempts by law enforcement to end the chase. In other circumstances this short period of time would weigh against mediation. Here, however, so much transpired in this short interval that I find this factor neutral in my analysis.

Regarding the second factor, the same circumstances addressed above that created an independent justification for the second stop (the multiple crimes Defendant committed as he fled) were also intervening circumstances that weigh in favor of finding attenuation.

Regarding the third factor,

The Supreme Court places a particular emphasis on any 'purpose and flagrancy of the official misconduct' in effecting the initial illegal entry." *United States v. Brandwein*, 796 F.3d 980, 985 (8th Cir. 2015), quoting *Brown v. Illinois*, 422 U.S. 590, 603–04 1975. "Application of

the exclusionary rule . . . does not serve [its] deterrent function when the police action, although erroneous, was not undertaken in an effort to benefit the police at the expense of the suspect's protected rights." *United States v. Simpson*, 439 F.3d 490, 496 (8th Cir. 2006) (quotation omitted). "An unreasonable mistake alone is not sufficient to establish flagrant misconduct." *United States v. Herrera-Gonzalez*, 474 F.3d 1105, 1113 (8th Cir. 2007); *see Strieff*, 136 S.Ct. at 2063.

*United States v. Yorgensen,* 845 F.3d 908, 915 (8th Cir. 2017).

Even if Officer Lukan lacked probable cause for the initial stop (and I have found there was probable cause), there is no evidence of any misconduct or any intention to benefit the police at the expense of Defendant's rights as described in *Yorgensen*. Despite Defendant's speculation to the contrary, there is no evidence that Officer Lukan was operating on a mere hunch about Defendant's possible intoxication. On the contrary, the evidence supports her testimony that she believed Defendant had cut her off and had failed to signal. Hence, the initial stop.

Officer Lukan testified that Defendant was wanted on two warrants and that she had not learned of those warrants until after stopping him. *Utah v. Strief* addressed how the existence of outstanding arrest warrants affects the attenuation doctrine. *Strieff*, 579 U.S. at 238. The Eighth Circuit held,

> *Strieff* did not announce a per se rule that the discovery of a warrant would always vitiate subsequent searches. Whether it is characterized as a part of the second element of the attenuation test (that the intervening event be unconnected to the purpose for the stop) or as a part of the third element of the attenuation test (that the officer not have a flagrant or unconstitutional purpose), *Strieff* instructs that we should decline to find attenuation where there is evidence that the police officer was engaged in a fishing expedition for old warrants.

*Lowry*, 935 F.3d 638, 644 (8th Cir. 2019). In the instant case, there is no evidence Officer Lukan knew of the warrants prior to initiating the first stop or that she was fishing for them when she decided to stop Defendant. Thus, under *Strieff* and *Lowry,* I conclude

the discovery of the preexisting warrants bolster the existence of attenuation whether they are considered under the second or third element of the test.

Based on the foregoing, I conclude that the attenuation doctrine applies and the evidence ultimately recovered from Defendant's person and his vehicle need not be suppressed.

### 4. Defendants Statements were also sufficiently attenuated.

Analysis of the attenuation doctrine regarding Defendant's statements includes an additional factor. To show that statements after an illegal search or seizure were voluntary such that any taint was purged, courts consider (1) whether *Miranda* warnings were given, (2) the "temporal proximity" between the constitutional violation and the statements, (3) intervening circumstances, and (4) the "'purpose and flagrancy of the official misconduct.'" *Riesselman*, 646 F.3d at 1080 (quoting *United States v. Lakoskey*, 462 F.3d 965, 975 (8th Cir. 2006)). *Riesselman* held that even if the district court had erred in finding no nexus between the Fourth Amendment violation and the defendant's later statements, it would have still affirmed because the government also showed that the statements were sufficiently attenuated from the constitutional violation that they were voluntary. *See id*.

Here, Officer Mosher testified Defendant was given his *Miranda* warnings twice, first in the sally port of the jail at approximately 12:27 a.m. (i.e., approximately 40 minutes after the initial stop and 34 minutes after the second stop.) He testified that a deputy sheriff gave *Miranda* warnings "closer to 1 [a.m.]." (Tr. 47.)

I find that the statements are sufficiently attenuated from the alleged constitutional violation. First, two *Miranda* warnings were given. *See id*. at 1080 (citing *Rawlings v. Kentucky*, 448 U.S. 98, 107 (1980) (provision of a *Miranda* warning is an "important, although not dispositive" factor)). Defendant did not appear to be impaired in any way

and appeared to be of at least average intelligence. This factor weighs in favor of finding the statements were attenuated.

When addressing temporal proximity, a short time between the constitutional violation and the statement may be enough to indicate that the statement was voluntary if other circumstances indicate the statement was "sufficiently an act of free will to purge the primary taint." *United States v. Palacios-Suarez*, 149 F.3d 770, 772-73 (8th Cir. 1998) (holding that consent was sufficiently an act of free will to purge the taint of the initial stop where the officer asked the defendant several times if he could search the vehicle nine minutes after the initial stop) (quotation omitted); *United States v. Herrera-Gonzalez*, 474 F.3d 1105, 1112 (8th Cir. 2007) (assuming defendant's consent was given only ten minutes after illegal stop does not "compel the conclusion that the consent was insufficient to purge the taint" without analyzing other factors).

Here, Defendant was *Mirandized* approximately 30 minutes after he was stopped the second time. Slightly more than half an hour passed after Officer Lukan stopped him. It is not clear from Exhibit 9 exactly when the interview commences, although it appears to be after Defendant was first *Mirandized* in the jail's sally port. This statement was not made "immediately on the heels" of the alleged constitutional violation. *See Lakoskey*, 462 F.3d at 975 (quoting *United States v. Duchi*, 906 F.3d 1278, 1285 (8th Cir. 1990)). This factor weighs in favor of finding the statements were attenuated.

A change in location can be an intervening circumstance that can make it more probable that statements are the product of free will. *Riesselman,* 645 F.3d at 1080. By the time Defendant made his statements at the police station, several intervening circumstances had occurred that served to purge the taint of the constitutional violation, including the changes in location from the A Avenue Bridge in Cedar Rapids, to a street in Hiawatha, Iowa, and back to the Linn County Jail. The changes effectively removed Defendant far from the side of the interstate where the alleged initial constitutional

violation occurred. *See Riesselman*, 646 F.3d at 1080 (citing *Vega-Rico*, 417 F.3d at 980). Second, Officer Lukan was not one of the officers involved in the interview. *See id.* Third, although it was after midnight and there was some evidence of intoxication, Defendant appeared alert and coherent when he spoke at the police station. I find that this factor weighs in favor of applying the attenuation doctrine.

As I concluded above, there is no evidence of any official misconduct. Thus, this factor, too, weighs in favor of attenuation.

Based on this analysis, I find that even if the detention was the but-for cause of Defendant's statements, there was sufficient attenuation of the statements from the alleged violation. Therefore, I **recommend** that the Court not suppress the statements.

## IV.    CONCLUSION

For the reasons set forth above, I respectfully recommend the District Court **deny** Defendant's Motions to Suppress. **(Doc. 16.)**

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise,* 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** at Cedar Rapids, Iowa, this 13th day of January, 2023.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa