# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 22-CR-60-CJW-MAR |
| Plaintiff, | |
| vs. | **ORDER** |
| JACQUES ROBINSON, | |
| Defendant. | |

_____

This matter is before the Court on defendant's Objections (Doc. 25) to the Report and Recommendation ("R&R") (Doc. 24) of the Honorable Mark A. Roberts, United States Magistrate Judge. On December 1, 2022, defendant filed a Motion to Suppress. (Doc. 16). The government timely filed a resistance. (Doc. 22). On December 20, 2022, Judge Roberts held a hearing on the motion. (Doc. 23). On January 13, 2023, Judge Roberts issued his R&R, which recommends that the Court deny the Motion to Suppress. (Doc. 24). On January 27, 2023, defendant timely filed his Objections. (Doc. 25). For the following reasons, the Court **overrules** defendant's Objections, **adopts** Judge Roberts' R&R with minor modifications in the factual findings, and **denies** the Motion to Suppress.

## I.      STANDARD OF REVIEW

When a party files a timely objection to a magistrate judge's report and recommendation, a "judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendation to which objection is made." 28 U.S.C. § 636(b)(1)(C); *see also* FED. R. CRIM. P. 59(b)(3) ("The district judge must consider de novo any objection to the magistrate judge's recommendation."); *United States v. Lothridge*, 324 F.3d 599, 600 (8th Cir. 2003) ("[A

district judge must] undertake[ ] a de novo review of the disputed portions of a magistrate judge's report and recommendations"). "A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C); *see also* FED. R. CRIM. P. 59(b)(3) ("The district judge may accept, reject, or modify the recommendation, receive further evidence, or resubmit the matter to the magistrate judge with instructions."). It is reversible error for a district court to fail to engage in a de novo review of a magistrate judge's report and recommendation when such review is required. *Lothridge*, 324 F.3d at 600. Accordingly, the Court reviews the disputed portions of the R&R de novo.

## II.     FACTUAL BACKGROUND

After reviewing the Hearing Transcript (Doc. 27), the Court finds Judge Roberts accurately and thoroughly set forth the relevant facts in the R&R. The Court thus adopts Judge Roberts' summary of the facts here, with minor modifications as noted below. The Court has, however, supplemented Judge Roberts' factual findings with additional citations. When relevant, the Court relies on and discusses additional facts in conjunction with its legal analysis.

Officer Lukan testified regarding her training and experience in law enforcement. She attended the Cedar Rapids police academy as well as another law enforcement academy. (*Id.*, at 4). She had been a correctional officer for several months and an officer for the Council Bluffs Police Department for one year before joining the Cedar Rapids Police Department ("CRPD") in 2008. (*Id.*)

On March 25, 2022, at about 11:44 p.m., Officer Lukan was driving a marked patrol car eastbound on the E Avenue Bridge. (*Id.*, at 4). The E Avenue Bridge is part of the Five-in-One Dam that crosses the Cedar River and also includes the Interstate 380 bridge. (*See id.*, at 4-5). Officer Lukan was traveling in the left-hand lane approaching the intersection of First Avenue NE. (*Id.*, at 22). This intersection is controlled by a

2

stop sign and flashing red lights. (Docs. 27, at 21; 22-1). Traffic proceeding eastbound in the left-hand lane enters an on-ramp for I-380 north. (Gov. Ex. 2.) Traffic in E Avenue's eastbound center lane proceeds onto A Avenue NE. (*Id.*)

Officer Lukan's patrol car was equipped with a dashcam. In addition to recording video through the patrol car's front window, the dashcam's software recorded other data such as time, vehicle speed, location, and whether certain vehicle equipment (e.g., lights, brakes, sirens, etc.) was engaged. (Gov. Ex. 6.) The dashcam video showed Officer Lukan's right turn onto eastbound E Avenue and her approach to the intersection. (*Id.*, at 23:44:20). Defendant's vehicle, a white Ford Fusion ("the Fusion"), was immediately in view at the commencement of the video as Officer Lukan made her turn. (*Id.*). Both vehicles proceeded toward the stoplight, Officer Lukan in the lefthand lane and the Fusion in the center lane. (*Id.*, at 23:44:30). The Fusion was ahead and to the right of Officer's Lukan's vehicle. (*Id.*). Officer Lukan's vehicle appeared to close the gap between them as both cars reached the stop sign at approximately the same time. (*Id.*, at 23:44:46).

Officer Lukan testified that she came to a full stop at the stop sign and it appears from the video that the vehicle very briefly stopped at 23:44:46. (*Id.*) She testified that there was a "lag" between the speed shown on the dashcam display or "arbitrator camera." (Doc. 27, at 9, 36). In other words, the speed shown does not necessarily reflect the actual speed of the vehicle shown simultaneously in the video. The video display does not show every gradation of speed as the car accelerates or decelerates. Moreover, the speed of Officer Lukan's car is not shown at zero at the point she testified she came to a complete stop.[1]

---

[1] "Whether Officer Lukan came to a complete stop is not relevant in and of itself. However, if she had not stopped, as the driver of the Fusion might have anticipated, it might have affected the driver of the Fusion's perception of whether it was safe to change lanes. Ultimately, I find that, despite the "lag" in the report of speeds, Officer Lukan's testimony that she came to a complete stop should be credited." (Doc. 24, at 4 n.3).

3

As Officer Lukan's patrol car proceeded through the intersection in her lane of traffic to the on-ramp, the Fusion accelerated ahead of the patrol car and into the lane leading to the on-ramp. (*Id.*, at 8). Officer Lukan did not apply the brakes, but she took her foot off the accelerator to avoid a collision. (*Id.*, at 8-9). Officer Lukan described the Fusion's maneuver as having "cut [her] off" (*Id.*, at 12, 31) in violation of Iowa Code Section 321.306(1) which provides:

> A vehicle shall be driven as nearly as practical entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.

Because Officer Lukan had to "change [her] acceleration of speed" to accommodate the Fusion's lane change, she believed it was unsafe for the Fusion to have changed lanes at this point. (*Id.*, at 24). The driver of the Fusion did not signal a change of lane by activating the vehicle's left turn signal. (*Id.*). Officer Lukan also believed the failure to signal was a violation of Iowa Code Section 321.314 (*Id.*, at 11) which provides:

> No person shall turn a vehicle from a direct course upon a highway unless and until such movement can be made with reasonable safety and then only after giving a clearly audible signal by sounding the horn if any pedestrian may be affected by such movement or after giving an appropriate signal in the manner provided in sections 321.315 through 321.318 in the event any other vehicle may be affected by such movement.

Iowa Code § 321.314.

Officer Lukan followed the Fusion up the on-ramp and onto northbound Interstate 380. (*Id.*). She testified that she did not immediately initiate a traffic stop because it was dangerous to do so on the "S curve" at this location. (*Id.*, at 12). Rather, she followed the Fusion and ultimately stopped it near the intersection of I-380 and Coldstream Road / 32nd Street by turning on her overhead lights. (*Id.*, at 11-12). She decided to stop the Fusion based on the unsafe lane change, a violation of Iowa Code 321.306(1). (*Id.*, at 12).

4

After the Fusion pulled to the side of the road, Officer Lukan approached its passenger side window. (Doc. 27, at 12; Gov. Ex. 1, at 23:47:58). She detected the smell of marijuana emanating from the vehicle and told defendant (who she identified in court) he was stopped for an improper lane change. (Doc. 27, at 13). She noticed that defendant had bloodshot, watery eyes, and slurred speech, which are indicators he was under the influence of alcohol or a controlled substance. (*Id.*, at 14). Before Officer Lukan could ask for identification, defendant drove off at a high rate of speed. (Doc. 27, at 15; Gov. Ex. 1, at 23:48:30). Officer Lukan testified that but for this initial stop, defendant would not have driven away. (Doc. 27, at 30-31). She announced over her radio that defendant was leaving the scene. (Doc. 27, at 15; Gov. Ex. 1, at 23:48:35).

Having heard Officer Lukan was at a traffic stop, Officer Cody Mosher[2] arrived at the scene in his patrol car as the Fusion sped away. (Doc. 27, at 14-15; Gov. Ex. 14, at 23:48:34). Officer Mosher commenced the primary pursuit of the Fusion with his lights and sirens activated while Officer Lukan joined the pursuit from behind. (Doc. 27, at 14-15; Gov. Ex. 14, at 23:48:36).

During the pursuit, Officer Mosher observed the Fusion reach a speed of 107 miles per hour in an area with a posted limit of 60. (Doc. 27, at 44-45). The Fusion ran red lights at the 42nd Street offramp and as it entered onto Highway 100 where it reached the speed of 82 in a 65 zone. (*Id.*, at 46). Officers deployed stop sticks in an attempt to deflate the Fusion's tires, but the Fusion missed the sticks. (*Id.*, at 47). After an additional pursuit, another law enforcement officer placed a vehicle in front of the Fusion

---

[2] "Officer Mosher has two associates degrees in criminal justice and law enforcement. He graduated from the Cedar Rapids police academy in 2015 and has been a police officer with the CRPD since that time." (Doc. 24, at 6 n.4 (citations omitted)).

and stopped it.  (Doc. 27, at 47; Gov. Ex. 1, at 23:53:33).  Officer Mosher[3] testified he believed there was probable cause to arrest defendant for eluding under Iowa Code Section 321.279.  (Doc. 27, at 48).

Defendant was ultimately apprehended in Hiawatha, Iowa after an approximately six-minute chase.  (*Id.*, at 16, 56).  When defendant exited the Fusion, he was searched incident to arrest and four pills of a suspected controlled substance were found on his person.  Officer Lukan believed this to be a violation of Iowa Code Section 155A.21.  (*Id.*, at 16-17).

After a drug detection canine alerted to the Fusion (Gov. Ex. 1, at 00:05:11), it was searched and a loaded Walther 9mm firearm was located between the Fusion's front passenger and rear passenger seats.  (Doc. 27, at 18).  Officer Alex Rink[4] was called and testified that he arrived at the scene and deployed his dog who indicated to the presence of controlled substances.  (*Id.*, at 55-56).  Law enforcement officers also determined that defendant was the subject of outstanding arrest warrants[5] and was driving while his license was under suspension in violation of Iowa Code Section 321.218.  (*Id.*, at 18-19).  In addition, Officer Lukan believed there was probable cause to believe defendant had committed the crime of interference with official acts in violation of Iowa Code Section 719.1 by driving away from the initial stop and by his behavior at the time of his arrest;

---

[3] In his factual findings, Judge Roberts mistakenly stated that Officer Lukan—not Officer Mosher—made this statement.

[4] "Officer Rink is a 2013 graduate of the Iowa Law Enforcement Academy.  He spent seven years with the Muscatine Police Department and has been with Cedar Rapids since July 2019." (Doc. 24, at 6 n.5).

[5] Judge Roberts found that officers found defendant was the subject of seven outstanding arrest warrants.  In appears this was a typographical error.  (*See* Doc. 24, at 20 (discussing two warrants)).  Reviewing the transcript and record, (*See* Doc. 27, at 18-19; Def. Ex. A, at 2), the Court finds defendant was the subject of two outstanding arrest warrants.  The amount of warrants, however, does not affect the Court's analysis.

6

i.e., refusing to sit in the back of a police vehicle and threatening to spit in an officer's face. (*Id.*, at 19). Additionally, defendant provided officers a false name which Officer Mosher believed to be interference with official acts. (*Id.*, at 48). Officer Mosher also noticed signs defendant might be impaired while driving including bloodshot, watery eyes, and slurred speech. (*Id.*, at 50-51).

Defendant was transported to the jail and given *Miranda* warnings twice. (Doc. 27, at 50-51; Gov. Ex. 9, at 1:15:00). He admitted he was drunk, and a breath test showed he had blood alcohol content of 0.128. (Doc. 27, at 50; Gov. Ex. 9, at 1:20:20, 1:20:55). This led Officer Mosher to conclude there was probable cause to believe defendant violated Iowa Code Section 321J.2 and was a second offense. (*Id.*, at 50-51). After a second *Miranda* warning, defendant admitted he was a convicted felon and that he carried a firearm every day. (Doc. 27, at 52; Gov. Ex. 9, at 1:21:46, 1:30:04). Officer Mosher testified that despite the evidence of intoxication, defendant appeared to be able to understand and was capable of giving a valid consent to the interview. (Doc. 27, at 54).

## III.   ANALYSIS

In the Motion to Suppress, defendant argues that Officer Lukan lacked probable cause to initiate the first traffic stop and evidence obtained from the second stop must be suppressed. (Docs. 16 & 17).

In his R&R, Judge Roberts recommended that the Court deny defendant's motion. (Doc. 24). Judge Roberts found Officer Lukan had reasonable suspicion and probable cause to stop defendant's vehicle in the first instance for traffic law violations. (*Id.*, at 11-13). Judge Roberts also found that even if the first stop was unconstitutional, the evidence obtained at and after the second stop should not be suppressed as fruit of the poisonous tree for three reasons. First, Judge Roberts found that officers had probable cause for new law violations, including interference with official acts. (*Id.*, at 13-16).

7

Second, Judge Roberts found defendant had not met his initial burden of establishing a causal nexus between the allegedly unlawful first stop and the discovery of the evidence. (*Id.*, at 16-18). Third, Judge Roberts found that the attenuation exception applied. (*Id.*, at 18-23).

Defendant objects to Judge Roberts' findings in the R&R that: (1) Officer Lukan stopped at the light prior to defendant cutting her off and, relatedly, that her testimony that she stopped was credible; (2) Officer Lukan had probable cause for the first stop; (3) assuming the first stop was unconstitutional, evidence obtained at and after the second stop was not fruit of the poisonous tree; and, (4) assuming the first stop was unconstitutional, evidence obtained at and after the second stop was sufficiently attenuated from the first stop. (Doc. 25). The Court addresses each objection in turn.

### A.    *Officer Lukan's Credibility*

Defendant objects to Judge Roberts' factual finding that Officer Lukan was credible considering her testimony that she stopped at the flashing red light before defendant changed lanes in front of her. (Doc. 25, at 2-3 (discussing Doc. 24, at 4, 12-13). Defendant bases this argument on the fact that the tracking system in Officer Lukan's car never recorded the car's speed as zero at or around the time she arrived at the light, immediately before defendant changed lanes in front of her.

Defendant is correct that the tracking system did not record the speed of Officer Lukan's car as zero at or around the time she stopped at the light. Defendant asserts this is because she did not stop. But the tracking system's failure to record a speed of zero does not mean she did not stop. Officer Lukan testified to a lag in the tracking system. But even without this testimony, comparing the dashcam video to the speeds displayed in the tracking system shows a persistent lag. As the system lags, it skips numbers. For instance, in the moments surrounding the light and defendant's lane change, the tracking system records Officer Lukan as travelling at the following speeds: 23, 22, 19, 14, 3, 7,

8

11, 22. (Gov. Ex. 1, at 23:44:44-23:44:53). These speeds cannot mean that Officer Lukan drove only at speeds of 14 miles per hour, 3 miles per hour, and 7 miles per hour, and did not drive at any of the speeds in between. Simply because the tracking system does not account for these speeds does not mean the car was not driven—if even for a split second—at those speeds. The same goes for whether the car was stopped—even for a split second—at the light. As such, there is no inconsistency between Officer Lukan's dash camera and arbitrator video in Government Exhibit 1 and Officer Lukan's testimony at the hearing. In short, there is no evidence before the Court supporting that Officer Lukan failed to stop but there is credible evidence that she did. Thus, the Court finds Officer Lukan stopped at the light and finds her testimony credible.

Accordingly, defendant's objections are **overruled**.

### B.    *Reasonable Suspicion for the First Stop*

For the following reasons, the Court overrules defendant's objections as to the first stop.

In the R&R, Judge Roberts found the evidence easily supported that Officer Lukan had reasonable suspicion that defendant "cut her off" and probable cause that defendant committed a traffic violation by unlawfully changing lanes and failing to signal. (Doc. 24, at 11-13 (citing IOWA CODE §§ 321.306(1), 321.314)). Judge Roberts dismissed defendant's arguments that Officer Lukan was acting on a hunch or executed the first stop in an inappropriate location, noting that the relevant inquiry was whether Officer Lukan had probable cause or reasonable suspicion to stop defendant. (*Id.*).

Defendant objects to Judge Roberts' legal conclusion that Officer Lukan had reasonable suspicion to make the first stop. (Doc. 25, at 1). Defendant asserts that he did not commit a traffic violation by changing lanes in front of Officer Lukan as he did. (*Id.*, at 2). Specifically, defendant argues (1) his lane change did not violate Section 321.306, as purportedly evidenced by "Officer Lukan's lack of braking and not having

9

to maneuver to avoid a collision," and (2) his failure to signal did not violate Section 321.306 or Section 321.314 because neither requires a motorist to signal when changing lanes under the circumstances. (*Id.*).

A traffic stop constitutes a seizure for purposes of the Fourth Amendment, and therefore must be supported by probable cause or reasonable, articulable suspicion that criminal activity has occurred or is occurring. *United States v. Hollins*, 685 F.3d 703, 705–06 (8th Cir. 2012); *United States v. Cox*, 992 F.3d 706, 709 (8th Cir. 2021); *United States v. Fuehrer*, 844 F.3d 767, 772 (8th Cir. 2016); *United States v. Sallis*, 507 F.3d 646, 649 (8th Cir. 2007). "Reasonable suspicion is a less demanding standard than probable cause[.]" *Alabama v. White*, 496 U.S. 325, 330 (1990).

Probable cause is present when "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Shackleford*, 830 F.3d 751, 753 (8th Cir. 2016) (cleaned up). "A[n] officer has probable cause . . . when the facts available to him would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." *Florida v. Harris*, 568 U.S. 237, 243 (2012) (cleaned up). "[T]he mere probability or substantial chance of criminal activity, rather than an actual showing of criminal activity, is all that is required." *United States v. Winarseke*, 715 F.3d 1063, 1067 (8th Cir. 2013) (internal citation and quotations omitted). In contrast, reasonable suspicion requires that an officer be "aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." *Hollins*, 685 F.3d at 705 (citation and internal quotation marks omitted). Whether under the probable-cause standard or reasonable-suspicion standard, an officer's subjective intentions play no part in the analysis. *Whren v. United States*, 517 U.S. 806, 813 (1996).

Defendant's objections are unavailing. First, Officer Lukan had both reasonable suspicion and probable cause to stop defendant for a violation of Section 321.306 based

on how he changed lanes in front of her. Officer Lukan testified—and her dashcam video supports—that she was driving straight forward when defendant began merging into her lane from the right. The way the Fusion moved directly into Officer Lukan's lane suggests that defendant did not see her vehicle behind him. As such, it suggests that he did not "first ascertain[ ] that such movement c[ould] be made with safety." This is particularly so given that Officer Lukan's car and the Fusion had been stopped next to each other only moments before, which suggests that had defendant looked to see if it was safe to change lanes at his speed, he would have realized that the lane change could not be made safely. *See* Iowa Code § 321.306 ("A vehicle shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety."). Further, Officer Lukan testified that she *did* have to act to avoid a collision caused by defendant's lane change. The dashcam video supports this. (Gov. Ex. 1, at 23:44:46). That Officer Lukan chose to take her foot off the acceleration instead of hitting the brakes makes no difference; either way, she had to slow her vehicle because of how defendant was changing lanes.

Though defendant argues that he could not foresee Officer Lukan's "rolling through the stop and hard acceleration through the intersection," those facts do not change the Court's analysis. First, the Court has already found that Officer Lukan did stop. Further, even if Officer Lukan rolled through a stop and quickly accelerated, defendant was required to look to see if it was safe to change lanes, and the Fusion's relatively slow movement directly in front of Officer Lukan's car supports that defendant did not first ascertain that this movement could be made safely.

In sum, Officer Lukan had probable cause to stop defendant on a Section 321.306 violation because she reasonably believed that defendant did not first ascertain that it was safe for defendant to change lanes as he did, and she had reasonable suspicion to stop

11

defendant because her belief was based on particularized and objective facts.[6] Thus, the first stop was not unconstitutional. *Hollins*, 685 F.3d at 705–706.

Defendant also argues he was not required to signal his lane change under Section 321.306 or Section 321.314. In the R&R, Judge Roberts did not address whether defendant was required to signal his lane change under Section 321.306. The Court finds defendant was not required to signal under Section 321.306. The statute does not mention turn signals and a review of Iowa cases supports that a signal requirement has not been read into Section 321.306. It is true that the Iowa Court of Appeals has discussed a failure to signal in the context of a Section 321.306 violation in circumstances somewhat similar to those here. *State v. Brooks*, No. 15-2073, 2017 WL 2181177, at *2 (Iowa May. 17, 2017). But the failure to signal in *Brooks*, as here, was not the only reasonable and objective indication that a Section 321.306 violation had occurred. *See id.* (affirming district court denial of motion to suppress when defendant changed lanes in front of police officer causing officer to "slow[ ] to avoid rear-ending [defendant's] car").[7]

Surprisingly, the question of whether Section 321.314 required defendant to use his signal when changing lanes is more complex. The statute's plain text and a review

---

[6] Contrary to defendant's argument in his motion to suppress (Doc. 17, at 4-5), the fact that Officer Lukan waited to stop defendant until after the S curve in the highway, at which point she could do so safely, does not change the Court's conclusion that Officer Lukan could lawfully stop defendant.

[7] Describing similar circumstances to those at issue here, the *Brooks* Court wrote:

> Our law does not require a collision, hard braking, or slowing substantially to trigger an infraction of Iowa Code section 321.306 . . .. It is undisputed that Officer Dixson had to take affirmative action in order to avoid colliding with Brooks's car. It is obvious from the video that in one continuous move, Brooks merged onto Keosauqua Way across one lane of traffic and into another, right in front of Officer Dixson, and did so without signaling his intentions. It appears Brooks was oblivious to the presence of the marked squad car.

of Iowa decisions support that Section 321.314's signal requirement applies when the vehicle in question is turning at a corner in the traditional sense. *See, e.g.*, *State v. Malloy*, 453 N.W.2d 243 (Iowa 1990) (right turn), *State v. Schlichting*, No. 16-0579, 2017 WL 2461490 (Iowa Ct. App. June 7, 2017) (left turn); *see also United States v. Miller*, 915 F.3d 1207 (interpreting Section 321.314 in light of *Malloy* and *Schlichting* to defendant's failure to signal "at a T[-shaped] intersection").

As defendant notes, the Iowa Court of Appeals has held that Section 321.314's signal requirement does not apply when the vehicle is changing lanes. *State v. Troge*, No. 08–2029, 2009 WL 3064648, at *2 (Iowa Ct. App. Sept. 17, 2009) ("We note that section 321.314 regulates turn signals at corners, not lane changes.").[8] Another Iowa Court of Appeals' decision incorporated this holding. *State v. Burbridge*, No. 14–1324, 2015 WL 5965077, at *2 (Iowa Ct. App. Oct. 14, 2015). But both cases are unpublished and therefore not precedential. *See* IOWA R. APP. P. 6.094.

At least one published opinion issued by the Iowa Supreme Court, however, appears to interpret Section 321.314 as applying to lane changes. To be sure, the express language of Section 321.314 does not mention changing lanes, but neither does it mention turning at a corner. It mentions turning: "No person shall *turn* a vehicle from a direct course upon a highway unless and until such movement can be made with reasonable safety and then only after giving [an appropriate signal.]" (emphasis added). But, the Iowa Supreme Court has interpreted a "direct course" as a straightforward course, though not necessarily a straight course. *Ruby v. Easton*, 207 N.W.2d 10, 17 (Iowa 1973). "A direct course will take a vehicle in precisely the direction of the lane of travel it is using on the highway." *Id.* "It follows that when a vehicle leaves such lane of travel it is

---

[8] In *Troge*, the Iowa Court of Appeals noted: "As the district court acknowledged in its ruling on Troge's motion to suppress, 'The failure to use a turn signal whi[l]e changing lanes may not be a violation of the Iowa Code.'" 2009 WL 3064648, at *2.

Case 1:22-cr-00060-CJW-MAR   Document 29   Filed 02/16/23   Page 13 of 21

turning from a direct course." *Id.* Of course, a vehicle leaves a lane of travel when it changes lanes. So, for purposes of Section 321.314, a vehicle turns from a direct course when it changes lanes. Accordingly, Section 321.314 requires a motorist to signal when changing lanes and Officer Lukan had probable cause to stop defendant for failing to signal in violation of Section 321.314 when he changed lanes in front of her.

Even if Section 321.314 did not require defendant to signal when changing lanes, it would be objectively reasonable for an officer to read the statute as applying to lane changes because a turn from a direct course could certainly be made at an angle other than, for instance, the traditional 90-degree-angle turn at an intersection. This is particularly so when the Iowa Supreme Court's published *Ruby* decision supports finding a signal requirement, even when unpublished Iowa Court of Appeals decisions do not. Accordingly, even if Officer Lukan was mistaken in believing she had probable cause to stop defendant for failure to signal under Section 321.314, her mistake of law was objectively reasonable and her testimony supports it was made in good faith. As such, it was not the kind of behavior the evidentiary exclusionary rule is meant to address. *See United States v. Leon*, 468 U.S. 897, 907-908 (2006) (finding indiscriminate application of the exclusionary rule inappropriate when officers act in objective good faith); *United States v. Smart*, 393 F.3d 767, 770 (8th Cir.2005). Thus, even if Officer Lukan was mistaken about what Section 321.314 required, she still had probable cause and reasonable suspicion to stop defendant based on a Section 321.314 violation. *See United States v. Cox*, 992 F.3d 706, 709 (8th Cir. 2021) (finding a mistake of law did not affect probable cause or reasonable suspicion when an objectively reasonable police officer would have believed a violation occurred).

For these reasons, the Court adopts Judge Roberts' findings that Officer Lukan had probable cause and reasonable suspicion to believe defendant violated Section 321.314 by failing to signal when changing lanes.

14

Accordingly, defendant's objection is **overruled**.

### C.     *Fruit of the Poisonous Tree*

Defendant objects to Judge Roberts' alternate legal conclusions that, if the first stop was unconstitutional, the evidence obtained at and after the second stop should not be suppressed as fruit of the poisonous tree. (Doc. 25, at 3-5). For the following reasons, the Court adopts Judge Roberts' findings and overrules defendant's objections as to the second stop.

#### 1.     *Probable Cause for New Law Violations & Causal Nexus*

Judge Roberts alternatively found that, assuming the first stop was unconstitutional, the first stop did not taint the second stop and the evidence obtained should not be suppressed as fruit of the poisonous tree. (Doc. 24, at 13-23). Judge Roberts' first basis for this finding was the fact that defendant fled the scene of the first stop "in a reckless manner that involved the commission of numerous traffic violations and, when later stopped, he committed additional law violations." (*Id.*, at 13). Judge Roberts noted that a prior unconstitutional stop does not necessarily render evidence obtained in a following stop to be fruit of the poisonous tree, especially when the defendant flees the first stop. (*Id.*, at 13-16).

Defendant objects, arguing that because the evidence would not have been seized but for the unlawful initial stop, the fruits of that stop should be suppressed. (Doc. 25, at 3).

One situation in which evidence is properly excluded is when the evidence is "evidence later discovered and found to be derivative of an illegality"—that is, "fruit of the poisonous tree." *Segura v. United States*, 468 U.S. 796, 804 (1984). Evidence qualifies as fruit of the poisonous tree when it (1) "would not have come to light but for the illegal actions of the police," and (2) "is in some sense the product of illegal governmental activity." *Id.*, at 815. "[T]he defendant bears the initial burden of

15

establishing the factual nexus between the constitutional violation and the challenged evidence." *United States v. Riesselman*, 646 F.3d 1072, 1079 (8th Cir. 2011) (quoting *United States v. Marasco*, 487 F.3d 543, 547 (8th Cir. 2007))

Here, even if Officer Lukan's first stop was unconstitutional and the first stop was the but-for cause of the second stop, the evidence recovered during and after the second stop would not be fruit of the poisonous tree because it was not the product of illegal government activity. *Segura*, 468 U.S. at 815; *Hudson v. Michigan*, 547 U.S. 586, 592 (2006) ("[B]ut-for causality is only a necessary, not a sufficient, condition for suppression."). To the contrary, the second stop was the product of defendant's illegal activity. After Officer Lukan pulled defendant over and came to his passenger door, defendant sped away, leading officers on a high-speed chase for several minutes until officers were able to block the Fusion in a residential neighborhood. Defendant's flight is an independent ground for arrest, even if the first stop was unconstitutional. *See United States v. Dawdy*, 46 F.3d 1427, 1431 (8th Cir. 1995). As Judge Roberts detailed, "this Court has expressly determined that fleeing from an unjustified *Terry* stop creates probable cause to effect an arrest for interference with official acts in violation of Iowa Code 719.1." (Doc. 24, at 15 (citing *McElree v. City of Cedar Rapids, Iowa*, 372 F. Supp. 3d 770, 791 (N.D. Iowa 2019), *United States v. Clark*, CR15-3030-MWB, 2015 WL 5184490, at *6 (N.D. Iowa Sept. 4, 2015), report and recommendation adopted, CR15-3030-MWB, 2015 WL 6472256 (N.D. Iowa Oct. 27, 2015)). Accordingly, officers had probable cause for the second stop based on defendant's flight, leading them on a high-speed chase, defendant's many traffic violations, and his interference with official acts. As such, evidence obtained during the second stop did not yield "indirect fruits of an illegal search or arrest." *See New York v. Harris*, 495 U.S. 14, 19 (1990). Thus, it need not be suppressed.

16

Further, the Court agrees with Judge Roberts that defendant has not met his initial burden of establishing a causal nexus between the allegedly unlawful *Terry* stop and the discovery of the evidence. (Doc. 25, at 17-18 (citing *United States v. Riesselman*, 646 F.3d 1072, 1079 (8th Cir. 2011)). Defendant does not point to any "specific evidence demonstrating taint." *Riesselman*, 646 F.3d at 1079; *Alderman v. United States*, 394 U.S. 165, 183 (1969).

Accordingly, defendant's objections is **overruled**.

### 2. *Attenuation*

Defendant also objects to Judge Roberts' alternate legal conclusion that evidence recovered from the second stop need not be suppressed because the attenuation exception applies. (Doc. 25, 3-5). The Court begins by addressing defendant's objection as to evidence found on defendant's person and in his vehicle, before addressing defendant's objection as to defendant's later statements.

### a. *Evidence from Defendant's Person and Vehicle*

Judge Roberts found that evidence recovered at the second stop was sufficiently attenuated from the first stop because (1) the six minutes between stops were "chock full of intervening circumstances"; (2) officers were independently justified in stopping defendant the second time; and, (3) even if Officer Lukan lacked probable cause for the first stop, there was no evidence of officer misconduct or intention to benefit the police at the expense of defendant's rights. (Doc. 24, at 18-21).

Defendant objects, arguing that (1) the first stop was the but-for cause of the second stop, (2) the two events were separated by six minutes, (3) "the events that followed the initial stop are not unconnected to the unconstitutional conduct of the unlawful stop," and (4) "the high-speed chase flowed from the initial stop and is not a sufficient intervening circumstance." (Doc. 25, at 3). Defendant also renews his

argument that Officer Lukan lacked reasonable suspicion for the first stop and asserts she instead had a hunch that defendant was intoxicated. (*Id.*, at 4).

One circumstance in which suppression is inappropriate is "when the connection between the unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance." *Utah v. Strieff*, 579 U.S. 232, 238 (2016); *see Hudson*, 547 U.S. at 592. "The attenuation doctrine evaluates the causal link between the government's unlawful act and the discovery of evidence[.]" *Id.* When determining whether the attenuation exception applies and therefore cures the taint of evidence found during an unconstitutional stop, a court must consider three factors: (1) the "temporal proximity" between the constitutional violation and the discovery of evidence, (2) intervening circumstances, and (3) the purpose and flagrancy of the official misconduct. *Strieff*, 579 U.S. at 239 (citing *Brown v. Illinois*, 422 U.S. 590 (1975)).

Applying the attenuation factors here, the Court agrees with Judge Roberts' finding that evidence found at and after the second stop was sufficiently attenuated from the first stop to cure the taint of any constitutional violations that might have occurred. Though a six-minute separation between stops might, under other circumstances, support a finding that the second stop was not sufficiently attenuated temporally, the intervening circumstances change that analysis here. As discussed, Officer Lukan pulled defendant over before he fled, leading police on a chase. Thus, the first stop was a but-for cause of defendant's flight and resulting chase. But this does not mean officers could not properly follow defendant, execute a second stop based on his flight, and arrest defendant. *See Dawdy*, 46 F.3d at 1431; *Hudson*, 547 U.S. at 592. Similarly, that the two stops were "not unconnected" does not mean the attenuation exception cannot apply. The Court also disagrees with defendant's assertion that the high-speed chase was not a sufficient intervening circumstance. Defendant affirmatively decided to engage in reckless and dangerous behavior, leading officers on a high-speed chase, endangering

officers, other motorists, and himself. Even if the chase was insufficient, defendant caused other intervening circumstances, too, including committing numerous traffic violations. Finally, even if the first stop was unconstitutional, there is no evidence of Officer Lukan's misconduct in stopping defendant. To the contrary, her testimony and the camera footage support that she believed she was pulling defendant over lawfully. And even if Officer Lukan was acting on a hunch,[9] that action would not be misconduct when, as here, she had probable cause and reasonable suspicion to stop defendant.

For all these reasons, the Court would find the attenuation exception applies to evidence found on defendant's person and in his vehicle, *see Strieff*, 579 U.S. at 238, making suppression unwarranted, *see Hudson*, 547 U.S. at 593.

Accordingly, defendant's objection is **overruled**.

> ### b.    *Evidence of Defendant's Statements*

Judge Roberts found defendant's statements to police were sufficiently attenuated from the first stop because (1) defendant received *Miranda* warnings twice and appeared to be of at least average intelligence and not impaired; (2) when defendant was interviewed, more than half an hour had passed since the first stop; (3) several intervening events of significance occurred; and, (4) there was no evidence of officer misconduct or intention to benefit the police at the expense of defendant's rights. (Doc. 24, at 21-23).

Defendant objects, arguing that (1) defendant made statements approximately 30 minutes after he was seized (citing *Brown v. Illinois*, 422 U.S. 590, 604 (1975)), (2) defendant would not have been in a police station absent the first stop, (3) the first

---

[9] The Court agrees with Judge Roberts that there is no evidence supporting that Officer Lukan was on a "fishing expedition for old warrants" because the evidence supports she did not know defendant had warrants out for his arrest. (*See* Doc. 24, at (quoting *United States v. Lowry*, 935 F.3d 638, 644 (8th Cir. 2019))). Because defendant does not argue that Officer Lukan was engaging in a fishing expedition, the Court does not engage in this analysis further.

stop was unlawful, and (4) though defendant received *Miranda* warnings twice, the *Miranda* factor is not dispositive. (Doc. 25, at 4-5).

When assessing whether statements after an illegal search or seizure were voluntary such that any taint was purged, the court undergoes the same analysis considering the three attenuation factors along with an additional factor: whether *Miranda* warnings were given. *Riesselman*, 646 F.3d at 1080. Defendant's objections based on the first stop as a but-for cause and the first stop being unlawful fail for the same reasons discussed in the context of evidence on defendant's person and in his vehicle. The Court has already found that significant intervening events occurred between the first stop and second stop. By the time defendant made his statements, even more intervening events had occurred. For instance, there was a change in location from the highway to the jail, defendant was interacting with officers other than Officer Lukan, and defendant appeared to have sobered up somewhat. Further, defendant twice received *Miranda* warnings. Though defendant urges the Court to find an insufficient amount of time had passed for the attenuation exception to apply, that argument is unavailing. In support, he cites *Brown v. Illinois*, in which the Supreme Court found statements were not sufficiently attenuated when the defendant's "first statement was separated from his illegal arrest by less than two hours." 422 U.S. at 604-605. But *Brown* goes on to say, "and there was no intervening event of significance whatsoever." *Id.* That is certainly not the case here. Considering all four *Riesselman* factors, the Court concludes that defendant's statements were voluntary.

For all these reasons, the Court would find the attenuation exception applies to statements made by defendant at the police station, *Riesselman*, 646 F.3d 1080, making suppression unwarranted, *see Hudson*, 547 U.S. at 592.

Accordingly, defendant's objection is **overruled**.

20

## IV.    CONCLUSION

For the reasons set forth above, defendant's Objections (Doc. 25) are **overruled**, Judge Roberts' Report and Recommendation (Doc. 24) is **adopted**, and defendant's Motion to Suppress (Doc. 16) is **denied**.

**IT IS SO ORDERED** this 16th day of February, 2023.

_____
C.J. Williams
United States District Judge
Northern District of Iowa

21